**Below is a Memorandum Decision of the Court.**



**Marc Barreca**
**U.S. Bankruptcy Court Judge**

**(Dated as of Entered on Docket date above)**

_____

—

### UNITED STATES BANKRUPTCY COURT
### WESTERN DISTRICT OF WASHINGTON AT SEATTLE

| | |
|---|---|
| In re:<br><br>Jan Gregory Maue and Mary Elizabeth Maue,<br><br>Debtors. | Case No. 18-13683-MLB |
| Cristi Kessler-Maue, Martin J. Maue, and James Craig Maue,<br><br>Plaintiffs,<br><br>vs.<br><br>Jan Gregory Maue and Mary Elizabeth Maue.<br><br>Defendants. | Adversary No. 19-01002-MLB<br><br>**MEMORANDUM DECISION** |

### *INTRODUCTION*

This matter came before me for trial on the complaint filed by Cristi Kessler-Maue ("**Cristi**"), Martin J. Maue ("**Martin**") and James Craig Maue ("**Craig**") (collectively "**Plaintiffs**"), seeking (1) a determination of the amount of debt owed by Jan Gregory Maue ("**Jan**") and Mary Elizabeth Maue ("**Mary**") (collectively "**Defendants**"); (2)  a determination that such debt is nondischargeable under 11

U.S.C. §§ 523(a)(2)(A), (a)(4) and (a)(6); and (3) an order enjoining Defendants from taking any further action in connection with family trusts and removing or suspending Jan as trustee.[1] The underlying claims are for breaches of fiduciary duties owed by Jan as trustee for three family trusts: the Maue Family Liquidity Trust ("**MFLT**"); the Ruby Mae Maue Trust ("**RMMT**"); and the Maue Property Trust ("**MPT**") (collectively the "**Trusts**"). Having reviewed the evidence and considered the arguments of counsel, and otherwise having good cause, I enter the following findings of fact and conclusions of law.[2] As discussed more fully below, I will enter a judgment liquidating and allowing the Plaintiffs' underlying claim and imposing a surcharge against the Defendants in the amount of $853,067.84, of which I determine that $686,496.60 is nondischargeable under §§ 523(a)(4) and (a)(6). I will also enjoin Jan from taking further actions concerning the Trusts, and I find that grounds exist to either remove or suspend Jan as trustee.

*PROCEDURAL HISTORY*

On September 25, 2018, the Defendants filed a petition for relief under chapter 13 of the Bankruptcy Code. On January 7, 2019, the Plaintiffs timely filed the present adversary proceeding. In addition to the claims for relief discussed in this decision, the Plaintiffs initially objected to entry of the Defendants' discharge under §§ 727(a)(2), (a)(4) and (a)(5), but have since withdrawn the objection.

Administration of the bankruptcy estate is heavily affected by adjudication of the present adversary proceeding. A chapter 13 plan has not been confirmed. On March 1, 2019, I entered an order denying confirmation. *See* Bankr. W.D. Wash. Case No. 18-13683-MLB, Dkt. No. 110. Within that same order, I continued the chapter 13 trustee's motion to dismiss subject to recall, continued the chapter 13 trustee's objection to exemptions subject to recall, continued the Plaintiffs' objection to

---

[1] Unless otherwise indicated, all title, chapter and section references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1532, and "Rule" references are to the Federal Rules of Bankruptcy Procedure.

[2] This memorandum decision constitutes my findings of fact and conclusions of law for purposes of Rule 7052. To the extent findings of fact are set forth in the conclusions of law, or vice versa, they should be construed as though set forth in their appropriate respective sections.

exemptions subject to recall and consolidated the Defendants' objection to proofs of claim nos. 4 and 5 into the present adversary proceeding.[3] I held a five-day trial from August 26-30, 2019.

## *JURISDICTION*

I have jurisdiction over "all civil proceedings arising under title 11, or arising in or related to cases under title 11." 28 U.S.C. § 1334(b).[4] A matter "arises under" title 11 if its existence depends on a substantive provision of the Bankruptcy Code and involves a cause of action created or determined by a statutory provision of the Bankruptcy Code. *Battle Ground Plaza, LLC v. Ray (In re Ray)*, 624 F.3d 1124, 1131 (9th Cir. 2010). "A proceeding 'arises in' a case under the Bankruptcy Code if it is an administrative matter unique to the bankruptcy process that has no independent existence outside of bankruptcy and could not be brought in another forum, but whose cause of action is not expressly rooted in the Bankruptcy Code." *Id*. The Ninth Circuit has adopted the "*Pacor* test" for determining the scope of "related to" jurisdiction. *Montana v. Goldin (In re Pegasus Gold Corp.)*, 394 F.3d 1189, 1193 (9th Cir. 2005) (citing *Pacor Inc. v. Higgins*, 743 F.2d 984, 994 (3d Cir.1984)). Under the *Pacor* test, "related to" jurisdiction exists if the outcome of the proceeding could have a conceivable effect on the bankruptcy estate and if the outcome could alter the debtor's rights or liabilities (either positively or negatively) in such a way which would impact administration of the estate. *Id*. "A bankruptcy court's 'related to' jurisdiction is very broad, 'including nearly every matter directly or indirectly related to the bankruptcy.'" *Sasson v. Sokoloff (In re Sasson)*, 424 F.3d 864, 869 (9th Cir. 2005) (citing *Mann v. Alexander Dawson (In re Mann)*, 907 F.2d 923, 926 n.4 (9th Cir. 1990)).

Here, I have exclusive jurisdiction to determine and enter final judgment as to whether the debt owed to Plaintiffs is nondischargeable under §§ 523(a)(2), (a)(4) and (a)(6). *Dietz v. Ford (In re Dietz)*, 760 F.3d 1038, 1043 (9th Cir. 2014). Additionally, I have authority and jurisdiction to adjudicate and

---

[3] Proof of claim no. 4 was filed by all the Plaintiffs and proof of claim no. 5 was filed solely by Martin. The Defendants objected to both claims on February 21, 2019.

[4] Although 28 U.S.C. § 1334(b) specifically confers jurisdiction to district courts, Congress allows district courts to refer the proceedings to bankruptcy courts. *See* 28 U.S.C. § 157(a). The Western District of Washington has made such a referral. *See* Local Rules W.D. Wash. 87(a).

liquidate Plaintiffs' underlying state law claims. *Id*. at 1043-50 (a bankruptcy court may liquidate a debt and enter final judgment in conjunction with finding the debt nondischargeable); *Sasson*, 424 F.3d at 870 (holding that "bankruptcy courts have jurisdiction and power to enter money judgments in adjudicating nondischargeability adversary proceedings"); *Stanbrough v. Valle (In re Valle)*, 469 B.R. 35, 43 (Bankr. D. Idaho 2012) ("In the case of an unliquidated debt, the bankruptcy court must necessarily determine liability and damages in order to establish the underlying debt. Adjudication of the underlying claim, which arises under nonbankruptcy law, becomes part and parcel of the dischargeability determination and thus integral to restructuring the debtor-creditor relationship.") (internal citations omitted).

Whether I have jurisdiction to grant Plaintiffs the injunctive relief requested is a closer call. Plaintiffs seek entry of an order that restrains Defendants from taking any further action in connection with the Trusts and that either suspends or removes Jan as trustee.

As indicated earlier, the scope of matters covered by "related to" jurisdiction is broad and covers proceedings that may have a conceivable effect on the bankruptcy estate and that could alter the administration of the estate. The bankruptcy estate includes "all legal or equitable interests of the debtor in property as of the commencement of the case." § 541(a)(1). Courts construe § 541 broadly to bring any and all the debtor's property rights within the bankruptcy court's jurisdiction. *See United States v. Whiting Pools, Inc.*, 462 U.S. 198, 205 n.9 (1983). "[W]hile assets transferred to a trust do not ordinarily become property of the bankruptcy estate of the trust's trustee, powers that a debtor who is trustee of a trust may exercise for his or her own benefit become property of the estate." *Cutter v. Seror (In re Cutter)*, 398 B.R. 6, 19 (9th Cir. BAP 2008) (citing *Askanase v. LivingWell, Inc.*, 45 F.3d 103, 106 (5th Cir. 1995)); *see also In re Gifford*, 93 B.R. 636, 640 (Bankr. N.D. Ind. 1988) ("Thus, what comes to the bankruptcy estate is not only the property in which the debtor has an interest, but also, the powers the debtor can exercise for its own benefit over property regardless of the title debtor may be acting under.").

Here, property held by the Trusts is likely not property of the estate. Conversely, Defendants' beneficial interest in the Trusts and Jan's legal interest as trustee are property of the estate. Therefore,

the bankruptcy estate is affected to the extent Plaintiffs seek an order, under applicable nonbankruptcy law, to restrain Jan from exercising his right to administer the Trusts and to either remove or suspend him as trustee. I therefore have "related to" jurisdiction to determine whether the requested injunctive relief is appropriate.

For these reasons, I have jurisdiction over the parties and the subject matter of this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper in the Western District of Washington pursuant to 28 U.S.C. § 1409.[5]

*FINDINGS OF FACT*

**A. Family Background**

1. Jan is the brother of the Plaintiffs and a debtor in this chapter 13 proceeding.

2. Mary, who is Jan's wife and a co-defendant in connection with the Plaintiffs' claims, is also a debtor in this chapter 13 proceeding.

3. Mary testified and I find that she has been married to Jan for 45 years and that they have lived in Washington for 26 years.

4. Plaintiffs and Jan's parents, Howard J. Maue ("**Howard**") and Ruby May Maue ("**Ruby**"), established a number of trusts during their lifetimes, however the only trusts created by them at issue in this litigation are the RMMT and the MFLT.

5. Plaintiffs and Jan also established the MPT to hold certain real property.

6. Jan was appointed trustee of the Trusts and remains the trustee.

7. Ruby died in 1995.

8. Howard died on March 11, 2017.

---

[5] The parties consent to my final adjudication of this adversary proceeding. *See* Pretrial Order, Dkt. No. 86.

**B. The Family Trusts**

<u>RMMT</u>

9.  The RMMT was established by Ruby, as the grantor, on September 18, 1992 and became irrevocable upon Ruby's death. *See* Pls.' Ex. 1.

10.  The beneficiaries of the RMMT are Howard, Cristi, Craig, Martin and Jan, as well as Howard's grandchildren.

11.  While Howard was alive, each beneficiary of the RMMT was entitled to so much of the income or principal of the trust as the trustee deemed necessary for the health, support and maintenance of the beneficiaries.

12.  After the death of Howard and Ruby, the RMMT called for the remaining assets to be divided and distributed outright to Craig, Martin, Cristi and Jan, *per stirpes*.

13.  The corpus of the RMMT consisted primarily of securities.

14.  The terms of the RMMT require that the trustee provide semi-annual reports of trust finances.

15.  The RMMT provides that the trustee shall receive compensation for his services as "agreed by the trustee and a majority of the adult beneficiaries." The RMMT also provides that trustee fees are to be charged against income.

16.  The RMMT also contains a choice of law provision, specifically, Article 4(g) that provides "[t]he Trust hereby created shall be deemed a Florida Trust and shall in all respects be governed by the laws of the State of Florida."

<u>MFLT</u>

17.  The MFLT was established by Howard, as the grantor, on May 25, 1995 and became irrevocable upon execution. *See* Pls.' Ex. 5.

18.  Craig, Martin, Cristi and Jan are beneficiaries of the MFLT.

19.  The MFLT was an insurance trust funded entirely with insurance policies, and it never held more than $150,000 in assets.

20.  The choice of law provision in the MFLT indicates that it was created under the laws of the state of Ohio, and pursuant to its terms, was intended to be administered pursuant to Ohio state law.

21.  Howard and Jan signed the MFLT agreement in Florida.

MPT

22.  The MPT was formed on December 15, 2000 by Craig, Cristi, Martin and Jan as the grantors and beneficiaries. *See* Pls.' Ex. 7.

23.  Howard was neither a settlor nor beneficiary of the MPT, however, the MPT was initially funded with property originally owned by Howard located at 425 Harbour Drive, Naples, Florida ("**425 Harbour Drive**").

24.  Pursuant to the MPT, Craig, Cristi, Jan and Martin owned equal shares in the trust and its property.

25.  In 2014, the MPT received an additional parcel of real property as a result of a Qualified Personal Residence Trust created on December 18, 2000, which contained Howard's residence located at 2850 Gulf Shore Rd. N., Naples, Florida ("**2850 Gulf Shore**").

26.  Jan was named the trustee of the MPT.

27.  Pursuant to the terms of the MPT, upon the first to occur of: (i) twenty-five (25) years after the date of the MPT agreement or (ii) the death of Howard Maue and a 50% vote of the then living grantors to terminate the MPT, the MPT would be terminated and the trustee was required to distribute the trust property in separate shares to each living Grantor.

28.  While the MPT was in existence, the terms provided that the trustee pay the grantors the net income of the trust, pro rata, at least annually.

29.  The MPT contains a Florida choice of law provision in Article VI, which provides "[t]his agreement shall be construed and administered according to the laws of the State of Florida (except as to real property which is situated outside the State of Florida and to which local law must apply)."

## C.  Jan as Trustee

30.  Jan served as trustee of the MFLT and the RMMT for more than two decades.

31.  Jan did not provide contemporaneous interim accountings for the Trusts. In August 2016, after litigation was instituted against Jan by the Plaintiffs, Jan provided approximately 15 years of "Interim Accounting Reports" for the MPT and RMMT, but it appears that Jan never provided any accountings for the MFLT.

32.  The Interim Accountings do not adequately distinguish between expenses, fees and distributions pertaining to the separate trusts, but instead essentially lump what Jan claimed to be decades worth of outstanding trustee fees, loans to beneficiaries, and unreimbursed trust expenses across all of the Trusts.  The Interim Accountings did not provide backup documentation.

## D.  Investigation into Jan's Acts as Trustee

33.  After receiving a letter from Howard's attorney in April 2014 requesting trust accountings for the MPT, Jan provided some financial information on April 22, 2014, but did not provide a full accounting. *See* Pls.' Ex. 322.

34.  Although Jan provided certain investment account statements in late April 2014, Jan did not disclose that he had just distributed $70,000 to himself from the RMMT on April 17, 2014, or that he planned to distribute $143,891 and $141,416 to himself on April 25 and April 30, 2014, respectively.

35.  In or about May 2014, Cristi requested documentation pertaining to the Trusts from Jan, including RMMT account statements, RMMT year-end accountings and a "report on income" from the MPT. *See* Pls.' Exs. 330 and 331.

36.  Jan did not disclose to the Plaintiffs that he considered the April 30, 2014 disbursement of $141,416 to be a loan to himself. At trial he asserted that the undocumented loan was unsecured, non-amortized and payable interest only on a monthly basis at an annual interest rate of 3.25%.  *See* Pls.' Ex. 128 and Defs.' Ex. 2, Tab 18.

37. The payment terms and interest rate of the purported loan by Jan as trustee to himself were far

more favorable than any of the purported loans made to his siblings and the interest rate was lower than the rate he was accruing for asserted trustee fees and unreimbursed expenses. *See* Pls.' Exs. 65, 90 and 119 at pg. 959.

38. On or about April 20, 2014, Jan sent a letter to Craig, advising him that he purportedly owed Jan, individually, $70,476.74, based upon various claimed advances and loans to Craig from 2003 to 2009. In the letter, Jan advised Craig to let him know whether he had funds available, or he would "release some of your trust money so you can pay your debt and clear the books." *See* Pls.' Ex. 90.

39. Without hearing back from Craig, Jan, as trustee, unilaterally satisfied the purported claim owed to Jan individually through the April 25, 2014 distribution of $143,981. *See* Pls.' Exs. 93 and 312 at pg. 3157.

40. The validity of this purported claim owed to Jan is questionable. More than three years prior, on January 31, 2011, Jan advised Craig that the debt owed to him consisted of only $98,541.70. *See* Pls.' Ex. 65. Craig paid this exact amount the next day. Pls.' Ex. 67.

41. Jan used at least $80,000 of trust funds to pay for Craig's legal fees, with money disbursed to Jan directly from the Trusts. These funds appear to have been used primarily for what the parties refer to as the Keating litigation (the "**Keating Litigation**"). Although Craig repaid Jan personally for this purported debt, Jan never returned any of this money to the Trusts. Moreover, Jan misrepresented disbursements made to himself in connection with these payments, indicating on the Interim Accountings that they were in fact distributions to Craig. *See* Pls.' Exs. 58, 59, 128 and 190 at pg. 1802.

42. On May 12, 2014, after failing to provide trust information requested by various beneficiaries, Jan received a letter from attorney, Brian McNamara, on behalf of Howard requesting an accounting and Jan to resign as trustee. *See* Pls.' Ex. 101.

43. Jan refused to resign, and instead, only days later, with Mary, quitclaimed his home to their family trust. *See* Pls.' Ex. 102.

44. On the eve of the bankruptcy petition filing, Jan and Mary transferred the property back into their individual names. Both Jan and Mary failed to disclose this transfer on their sworn bankruptcy statement of affairs.

45. On June 10, 2014, Jan sent a letter to Howard, assertedly enclosing account statements for the RMMT. In that same letter, Jan indicated that Howard had requested that Jan distribute $300,000 from the RMMT to a Morgan Stanley account to "settle family debts and provide for future cash needs." *See* Pls.' Ex. 104. Jan testified that he sent this letter to remind Howard of his prior directive because of Howard's allegedly failing memory.

46. The June 10, 2014 letter was sent only one month after receipt of the letter from Howard's attorney requesting accountings and around the same time Jan hired attorneys, with RMMT funds, to have Howard declared incapacitated. Given the timing, the assertion that Howard requested Jan distribute $300,000 from the RMMT to settle family debts is not credible.

47. Despite Jan's assertion that the $300,000 transferred from the account in the RMMT was no longer part of the trust, bank records for RMMT establish that another RMMT account was created under the name of the trust, with Jan as trustee. Further, all distributions from both RMMT accounts were signed by Jan as trustee of the RMMT.

48. Jan's self-serving testimony regarding the "distribution to Howard" is inconsistent with the financial records and is not credible. Jan provided no basis to distribute almost 50% of the RMMT to Howard, who was an equal beneficiary with the Plaintiffs. Jan also provided nothing to support that Howard authorized Jan to serve as a "trustee" of the $300,000 he supposedly distributed to Howard. For these reasons, I find that no "distribution" of $300,000 from the RMMT actually took place.

49. Jan testified, without providing factual or legal support, that the April 1, 2014 distribution to himself in the amount of $70,000 was his one quarter share of the $300,000. Besides $70,000 not being one-quarter of $300,000, I also note that Jan sent a memorandum to the Plaintiffs in May 2014 advising

them that no beneficiary had a "vested" share of the RMMT pursuant to the trust document. *See* Pls.' Ex. 97.

50.  Jan testified that he frequently created documentation and reports to present to his siblings at family trust meetings but destroyed all evidence of the spreadsheets and did not preserve any records on his computer.  Jan's testimony that he satisfied his obligation to account by having annual trust meetings lacks credibility and is not supported by the evidence.

51.  Jan's testimony regarding the "meetings" was contradicted by his May 2014 memorandum, in which he advised that he swore "an oath to Howard" never to disclose the financial information pertaining to the trusts to any of the beneficiaries. *See* Pls.' Ex. 97.

52.  Jan was unable to produce any copies of the alleged annual trust financial accountings. Jan testified that he did not keep copies because he was not required to keep copies for more than one year.

53.  Craig, Martin, and Cristi's husband Richard Kessler, testified that no reports were ever provided until after demands were made in 2014 and the Plaintiffs' filed their legal action in Florida in 2015.

54.  As reflected in Table A, Jan made a significant number of disbursements from the Trusts between 2006 and 2019, which exceeded $934,000, and deposited the funds into the Defendants' joint accounts.  Jan admitted that he distributed this amount to himself and his wife from the Trusts' assets.

55.  Jan also disbursed $100,000 to Boston Co., purportedly for the benefit of Howard. However, he failed to provide any documentation to support his allegation that the deposit was for Howard, or for a trust purpose.  These disbursements, which occurred between February 2006 and October 2009, have never been repaid to the trust or accounted for in any manner by Jan, and were not disclosed to the Plaintiffs until 2016, after the Plaintiffs brought litigation against Jan in Florida.

56.  Jan disbursed $85,000 to Howard in February 2009 from the RMMT.

57.  While Jan was the trustee and in control of and responsible for tax preparation and payments by the Trusts to the Department of Revenue, Jan authorized the submission of the MPT tax return for

2013, which reflected a refund credit of $89,252 for a deduction on trust distribution of $454,822. *See* Pls.' Ex. 304. However, the accounting shows $0 in distributions for 2013. Jan testified that he never received the tax refund.

58. The 2014 Interim Accounting for the RMMT dated April 15, 2015 contained an entry noting a $70,000 distribution to Jan. The entry contained no explanation for the distribution despite explanations for all other entries in that report. The report also listed distributions for $49,000 and $71,167 to Jan for partial payment of debts assertedly owed to Jan, individually, by Martin and Craig. Jan paid himself with funds from the Trusts despite not receiving authorization to do so from Martin and Craig. *See* Pls.' Ex. 310.

59. In February 2016, after being requested to provide accountings, and after being requested to resign, Jan distributed $220,000 from the Maue Property Trust to his wife and himself as reimbursement of personal expenses that he claimed to be trust expenses. Jan failed to provide competent evidence that the $220,000 was related to trust expenditures. Jan also failed to notify the beneficiaries that he intended to disburse these funds to himself and Mary until long after he took the money.

60. In 2016, after litigation was brought by the Plaintiffs in Florida, Jan provided in bulk almost 15 years of Interim Accountings, without back up support or documentation. The Interim Accountings indicate that many disbursements were for individuals other than Jan and for undisclosed expenses, loans or other activities. However, source documents from the financial institutions show that many of these disbursements were made directly to Jan and Mary's personal bank accounts. For instance, the 2014 RMMT Interim Accounting shows a $49,000 distribution to Jan for Martin in partial payment of Martin's debts to Jan. It also shows a $71,167.92 distribution to Jan for partial payment of Craig's debts to Jan. These two distributions total $120,167.92. However, financial source documents show that the actual distribution was in the amount of $143,891 and went to Jan directly. Without providing evidentiary support, Jan treated the difference as a payment to himself for a reduction of allegedly long-term debts owed to Jan.

61. Jan provided a voluminous record of receipts to his expert shortly before trial, asserting that the receipts justified the large disbursements that Jan made to himself as reimbursement for trust expenditures. The receipts reflect various expenditures that Jan incurred individually from 1993 through 2014. However, Jan did not provide evidence of how the overwhelming majority of these receipts pertained to trust business.

62. Jan brought litigation against Craig in New Jersey for money he claimed was owed to him by Craig. He also individually brought a defamation suit against Cristi in Florida. Jan also defended a suit brought against him as trustee of a separate trust in California for issues unrelated to the Trusts at issue in this case. Although the litigation did not pertain to the Trusts or Jan's activities as trustee, Jan distributed $63,651.95 from the RMMT to pay his legal expenses for those lawsuits.

63. Jan made other disbursements to attorneys as provided for in Table B in the total amount of $132,094.98, which are discussed at greater length in the Conclusions of Law below.

64. In May 2013, the 425 Harbour Drive property owned by the MPT was sold for approximately $690,000. *See* Pls.' Ex. 78. In August 2013, Jan distributed Cristi's share of the MPT proceeds in the amount of $145,000. Jan retained a portion of Cristi's share for the payment of a capital gains tax. *See* Pls.' Ex. 97, pg. 0834.

65. Despite indicating to a banker at Morgan Stanley that the $145,000 disbursement to Cristi was a beneficiary distribution, after Cristi confronted Jan in 2014 with respect to Jan's actions as trustee, Jan identified the disbursement as a loan. *See* Pls.' Exs. 80 and 286.

66. In the Interim Accounting, Jan identified the $145,000 distribution as a loan to Cristi with an interest rate greater than the interest rate he imposed upon himself. Jan provided no documentation to support his contention that Cristi "borrowed" the funds from the MPT.

67. Martin and Craig never received their one-fourth shares from sale of the 425 Harbour Drive property, despite requests to Jan to make such distributions.

68.  After the death of Howard on April 14, 2017, Craig and Martin voted to terminate the MPT. *See* Pls.' Ex. 427.  Cristi also voted to terminate the MPT and for distribution of the MPT assets. Accordingly, the trust property should have been distributed to the beneficiaries pursuant to the terms of the MPT.

69.  The Plaintiffs' forensic accountant, Mr. McFarland, identified $259,991.96 in disbursements to "unknown" persons or entities. *See* Pls.' Ex. 128. During trial, Mr. McFarland testified that after being provided further documentation from Defendants just prior to trial, he was able to properly account for a large portion of the unknown disbursements. However, even after these documents were produced, Mr. McFarland still identified approximately $19,000 in unsupported payments to Jan, and $69,000 in additional payments to Jan's attorneys.  Jan provided no invoices or support to substantiate the attorneys' fees as having been incurred for trust business.

70.  By way of comparison, from 2006 to present, Jan disbursed a total of $934,376.80 directly to himself from the Trusts, not including attorneys' fees.  During that same period of time, Craig received two distributions totaling $30,000; Cristi received $146,309.00, comprised of three disbursements; Howard received a total of $159,679.41; and Martin was distributed nothing. *See* Pls.' Ex. 128.

71.  Jan's actions show a pattern of treating the Trusts' assets as his personal bank, from which he enjoyed unfettered access. Jan deliberately withheld information and intentionally created a pattern of deception, convenient record keeping and improper disbursements which personally benefited him.

*CONCLUSIONS OF LAW*

**A.  Choice of Law**

"While the existence or not of a fiduciary relationship, and the breach or not of a trustee's duty in such a relationship, are questions of federal law, they are informed in large measure by state law." *Whittaker v. Whittaker (In re Whittaker)*, 564 B.R.115, 142 (Bankr. D. Mass 2017) (citing *Dennis v. Hall (In re Hall)*, 483 B.R. 281, 292 (Bankr. D. Conn. 2012)).  To properly adjudicate the underlying claims, I must first determine which state law applies.  Both the RMMT and the MPT provide that the trust shall

be governed by Florida law. In contrast, the MFLT provides that the trust shall be governed by Ohio law.

Federal courts in the Ninth Circuit and Washington state courts both look to the Restatement (Second) of Conflicts of Law (1971) (the "**Restatement**") for choice of law rules.[6] *See Liberty Tool & Mfg. v. Vortex Fishing Sys., Inc. (In re Vortex Fishing Sys., Inc.)*, 277 F.3d 1057, 1069 (9th Cir. 2002); *see also FutureSelect Portfolio Mgmt., Inc. v. Tremont Grp. Holdings, Inc.*, 180 Wn.2d 954, 967 (2014).

The modern choice of law analysis generally requires the application of the state's law with the most significant relationship to the matters at issue. *See Aqua-Marine Constructors, Inc. v. Banks*, 110 F.3d 663, 673 (9th Cir. 1997) (citing Restatement § 6 cmt. c). Although § 6 of the Restatement covers general factors for consideration when analyzing choice of law, other sections of the Restatement specifically deal with the validity and enforceability of a choice of law clause in a trust agreement. *See Green v. Zukerkorn (In re Zukerkorn)*, 484 B.R. 182, 189 (9th Cir. BAP 2012).[7] Under the Restatement, the choice of law clauses in the Trusts should be upheld, if the designated state law bears a substantial relation to the Trusts. *See* Restatement § 187(2)(A); § 270(a). "[A] state has a substantial relation to a trust if at the time the trust is created: (1) the trustee or settlor is domiciled in the state; (2) the assets are located in the state; and (3) the beneficiaries are domiciled in the state." *In re Zukerkorn*, 484 B.R. at 192 (citing Restatement § 270 cmt. b).

Applying these principles, only Florida, and not Ohio, has a substantial relation to the relevant trusts. Howard and Cristi resided in Florida for much of the time periods in which the trusts were administered. The family met at various times throughout the years at locations in Florida, sometimes discussing trust business. 2850 Gulf Shore and 425 Harbour Drive, real properties held by the MPT, are

---

[6] I note that for matters in which a court has exclusive jurisdiction, such as my current determination of dischargeability, the court should apply federal and not forum state choice of law rules. *Lindsay v. Beneficial Reinsurance Co. (In re Lindsay)*, 59 F.3d 942, 948 (9th Cir. 1995). However, the present case also involves the establishment of debt and requests for injunctive relief under state law, for which forum choice of law rules are appropriate. Here, the distinction is inconsequential as both the applicable federal and state choice of law rules look to the Restatement.

[7] As noted in *Zukerkorn*, legal questions arising under trust law often implicate both the choice of law rules for contracts and those applicable to trusts. *In re Zukerkorn*, 484 B.R. at 189. The choice of law rules for contracts and trusts contain factors that are substantially similar for purposes of this analysis. *Id.* at 189 n.10.

both located in Florida. Even the MFLT, which is the only trust that does not designate Florida law, was executed and notarized by the grantor, Howard, in Florida.

As the MPT and the RMMT contain choice of law provisions designating the application of Florida law, the choice of law provisions should be upheld. Conversely, the MFLT designates the application of the law of Ohio, a state which bears little, if any, relationship to the MFLT or the parties in interest. As it appears that the settlor executed the MFLT while in Florida and the evidence indicates that Florida has a more significant relationship to the trust, I conclude that Florida law should apply. Accordingly, I look to Florida law to adjudicate the underlying state law claims concerning the Trusts.

**B. State Law Claims**

Breach of Trust in Florida

Under Florida law, "[u]pon acceptance of a trusteeship, the trustee shall administer the trust in good faith, in accordance with its terms and purposes and the interests of the beneficiaries, and in accordance with [the Florida Trust Code]." *Berlinger v. Wells Fargo, N.A.*, 2016 U.S. Dist. LEXIS 23158, at *30-31 (M.D. Fla. Feb. 25, 2016) (quoting Fla. Stat. § 736.0801). "A breach of trust is '[a] trustee's violation of either the trust's terms or the trustee's general fiduciary obligations.'" *Covenant Trust Co. v. Guardianship of Ihrman,* 45 So. 3d 499, 504 (Fla. 4th DCA 2010) (quoting Black's Law Dictionary 201 (8th ed. 2004)); *see also* Fla. Stat. § 736.1001(1). "The elements of a claim for breach of trust or fiduciary duty under Florida law are: (1) the existence of a fiduciary duty; (2) the breach of that duty; and (3) damage proximately caused by that breach." *Berlinger*, 2016 U.S. Dist. LEXIS at *31 (internal quotation marks omitted) (quoting *Treco Int'l S.A. v. Kromka*, 706 F. Supp. 2d 1283, 1288 (S.D. Fla. 2010) and citing *Gracey v. Eaker*, 837 So. 2d 348, 353 (Fla. 2002)).

Even if a trust document grants the trustee broad discretion, it does not absolve a trustee from adhering to his or her obligations to act in good faith and to act judiciously in administering trust assets. *Mesler v. Holly*, 318 So. 2d 530, 533 (Fla. 2d DCA 1975). The Florida Trust Code sets forth various duties owed by a trustee. *See* Fla. Stat. § 736.0801 (duty to administer trust in good faith and in accordance

with the interests of the beneficiaries); Fla. Stat. § 736.0802 (duty of loyalty); Fla. Stat. § 736.0803 (duty of impartiality when trust has two or more beneficiaries); Fla. Stat. § 736.0810 (duty to keep distinct, clear and accurate records); Fla. Stat. § 736.0813 (duty to keep beneficiaries reasonably informed and to provide accountings at least annually); Fla. Stat. § 736.08135 (trust accounting must be a reasonably understandable report from the date of the last accounting).

There are additional obligations placed on a trustee when he or she is also a beneficiary. Under Fla. Stat. § 736.0814, unless the terms of a trust *explicitly* states that a rule in the statute does not apply, a person who is both a beneficiary and a trustee may not:

> (a) Make discretionary distributions of either principal or income to or for the benefit of that trustee, except to provide for that trustee's health, education, maintenance, or support as described under ss. 2041 and 2514 of the Internal Revenue Code;
> (b) Make discretionary allocations of receipts or expenses as between principal and income, unless the trustee acts in a fiduciary capacity whereby the trustee has no power to enlarge or shift any beneficial interest except as an incidental consequence of the discharge of the trustee's fiduciary duties;
> (c) Make discretionary distributions of either principal or income to satisfy any of the trustee's legal support obligations; or
> (d) Exercise any other power, including, but not limited to, the right to remove or to replace any trustee, so as to cause the powers enumerated in paragraph (a), paragraph (b), or paragraph (c) to be exercised on behalf of, or for the benefit of, a beneficiary who is also a trustee.

Fla. Stat. § 736.0814(2). None of the agreements for the Trusts contain an explicit waiver of Fla. Stat. § 736.0814. Accordingly, a trustee in Florida like Jan, who is also a beneficiary, may not make discretionary distributions to himself of either principal or income, except to provide for his health, education, maintenance or support. *Id.*; *see also In re Kiesewetter*, 2011 U.S. Dist. LEXIS 110573, at *36 (W.D. Pa. Sept. 28, 2011).

The beneficiaries have the burden to demonstrate that a breach of trust occurred and that it resulted in injury. *See Taylor v. Taylor*, 2018 Fla. Cir. LEXIS 3787, at *14 (Fla. Cir. Ct., Jan. 23, 2018) (citing *Fort Myers Memorial Gardens, Inc. v. Barnett Banks Trust Co.*, 474 So. 2d 1215, 1218 (Fla. 2d DCA 1985)). Conversely, a trustee has the burden of proving that all expenses incurred by him or her, including

attorneys' fees, were reasonably necessary and incurred for the benefit of the trust. *Ortmann v. Bell*, 100 So. 3d 38, 46 (Fla. 2d DCA 2011); *see also Traub v. Traub*, 135 So. 2d 243, 244 (Fla. 2d DCA 1961) (quoting *Benbow v. Benbow*, 117 Fla. 37, 157 So. 512, 519 (Fla. 1934)) ("If the trustee fails to keep clear, distinct, and accurate accounts, all presumptions are against him and all obscurities and doubts are to be taken adversely to him. If he loses his accounts, he must bear any resulting damage… the burden of proof is upon him to show that the money expended was a proper disbursement.").

Once a breach of trust or fiduciary duty has been established, there are a variety of remedies available under Florida law. Under Fla. Stat. § 736.1001, the court may order the trustee to pay money or restore money to redress a breach of trust and the court may reduce or deny compensation to the trustee. Fla. Stat. § 736.1001(2)(c) and (h). Similarly, Fla. Stat. § 736.1002 provides in relevant part:

> A trustee who commits a breach of trust is liable for the greater of:
> (a) The amount required to restore the value of the trust property and trust distributions to what they would have been if the breach had not occurred, including lost income, capital gain, or appreciation that would have resulted from proper administration; or
> (b) The profit the trustee made by reason of the breach.

Fla. Stat. § 736.1002(1). "A 'surcharge' is the amount that a court may charge a fiduciary that has breached its duty." *Reed v. Long*, 111 So. 3d 237, 238 (Fla. 4th DCA 2013) (citing *Merkle v. Guardianship of Jacoby*, 862 So. 2d 906, 907 (Fla. 2d DCA 2003)). The purpose of a surcharge is to make the estate whole when the fiduciary's conduct has caused loss or damage to the estate. *Reed*, 111 So. 3d at 239. In the context of a breach of trust proceeding, the court may surcharge a trustee and impose personal liability for breaches of fiduciary duty through either intentional or negligent conduct. *See Miller v. Miller*, 89 So. 3d 962, 962 n.1 (Fla. 5th DCA 2012) (citing *Surcharge*, Black's Law Dictionary (6th ed. 1990) and *Harding v. Rosoff*, 951 So. 2d 912, 914 (Fla. 4th DCA 2007)).[8] Moreover, the trial court has the power to order

---

[8] I also note that some courts refer to the compensatory relief requested for a breach of trust as "disgorgement" and not a "surcharge". *See e.g.*, *Kritchman v. Wolk*, 152 So. 3d 628 (Fla. 3d DCA 2014); *McCormick v. Cox*, 118 So. 3d 980 (Fla. 3d DCA 2013). Black's Law Dictionary defines surcharge as an imposition of a "fine on a fiduciary for a breach of duty." *Surcharge*, Black's Law Dictionary (11th ed. 2019). Alternatively, Black's Law Dictionary defines disgorgement as "the act of giving up something (such as profit illegally obtained) on demand or by legal compulsion." *Disgorgement*, Black's Law

disgorgement of trustee's fees. *See McCormick v. Cox*, 118 So. 3d 980, 987 (Fla. 3d DCA 2013) (affirming the disallowance of trustee's fees); *Ortmann*, 100 So. 3d at 45 ("A trustee may forfeit the right to compensation if the trustee has committed a breach of the trust or otherwise willfully engaged in bad faith or misconduct with respect to the management of the trust.").

<u>Jan's Breaches of Fiduciary Duties</u>

Jan, as trustee of the Trusts, owed the Plaintiffs the above-mentioned fiduciary duties as provided in the Florida Trust Code. Jan breached his duty to administer the Trusts in good faith, failed to administer the Trusts solely in the interests of the beneficiaries, failed to treat the beneficiaries impartially, and failed to provide timely and accurate accountings. Although Jan testified that he held annual trust meetings on family vacations, it appears that even when these vacations occurred, they occurred without all beneficiaries being present, and in certain instances, without all beneficiaries being invited. I therefore find that the family vacations were insufficient to meet the annual accounting requirement under the Florida Trust Code. Jan exhibited a pattern of disbursing trust money to himself assertedly to pay back debts he testified were owed to him by the Plaintiffs, but without their knowledge or approval.[9] Jan concealed disbursements made to himself and took excessive, disproportionate distributions. Jan failed to document the purpose of distributions, mischaracterized distributions as loans, commingled trust expenses with personal expenses and received reimbursement for personal expenses unrelated to the Trusts. Jan attempted to justify the disproportionate distributions made to himself by crafting an after-the-fact accounting which sought to label disbursements as reimbursements years after the disbursements were made, without any contemporaneous accountings or other sufficient documentation which could

---

Dictionary (11th ed. 2019). In the pending case, to the extent Jan is being asked to pay back funds that he improperly disbursed to himself, it appears that both "disgorgement" and "surcharge" are terms that appropriately fit Plaintiffs' requested relief. There does not appear to be any substantive difference in legal analysis between courts that impose a surcharge versus courts that order disgorgement.

[9] I note that it appears that many of the asserted debts owed to Jan accrued more than four years before Jan disbursed funds to himself as repayment, which exceeds the statute of limitations on an action under Florida law based on a contract or written instrument. *See* Fla. Stat. § 95.11(3)(k). By disbursing money to himself from the share of trust proceeds the Plaintiffs were otherwise entitled to, Jan effectively stripped away any opportunity the Plaintiffs would otherwise have to raise a state law defense to Jan's asserted claims.

indicate whether expenses were in fact for trust purposes. In 2014, around the same time the beneficiaries became suspicious of Jan and requested trust information, Jan made three significant distributions to himself, totaling $355,307, without proper disclosure or justification. Jan, as both a trustee and beneficiary, improperly took discretionary disbursements for purposes other than his own health, education and maintenance. In short, Jan grossly mismanaged the Trusts by not keeping sufficient records and he acted in bad faith by using the Trusts for personal gain and without concern for the other beneficiaries. Based on the above-referenced breaches of fiduciary duty, Plaintiffs were directly harmed and deprived of the share they should have received as beneficiaries of the Trusts. For these reasons, I conclude that Plaintiffs have met their burden in establishing breaches of trust under Florida law.

<u>Surcharges and/or Disbursements</u>

In order to calculate the proper amount of the surcharge, I must determine which of the relevant disbursements were improper. As mentioned earlier, the trustee has the burden to demonstrate that each of the disbursements were reasonably necessary and were incurred for the benefit of the trusts. Furthermore, where a trustee has failed to keep accurate and timely records, as is the case here, all presumptions must be taken against the trustee in determining damages. In the present case, Jan has submitted numerous receipts, attempting to show that the disbursements were proper reimbursements for trust expenses. I acknowledge that it is possible that some of these expenses were incurred for the benefit of the trust, however, given the utter lack of record-keeping and the negligent administration of the trusts, it is, for the most part, impossible to distinguish which expenses were incurred for the benefit of the trusts and in the interests of the beneficiaries.

I will individually address each of the following disbursements put at issue in this proceeding.

*Disbursements to Jan[10]*

1. April 7, 2006 disbursement of $24,048.00 from the RMMT. In support of this disbursement, the Defendants provide two checks: (1) a check for $5,090 made out to Howard Maue for "1 Quarter

---

[10] Please refer to Table A for an itemization of all disbursements made to Jan.

MEMORANDUM DECISION - 20

Est. Taxes"; and (2) a check for $18,958.00 made out to the Internal Revenue Service. *See* Defs.' Ex. 2, Tab 1. These checks, which were issued by Jan in 2006, add up exactly to the amount disbursed from the RMMT to his personal account. The amounts were also accurately disclosed on Defendants' late provided accountings and are substantially similar to the total tax amount reflected in the RMMT 2005 Amended Fiduciary Tax Return. *See* Pls.' Exs. 160 and 171. Payment to the Internal Revenue Service and distribution to Howard, as a beneficiary of the RMMT, for taxes were permissible under the trust terms, although I note that they should have been made directly from the RMMT and not from Jan's personal bank account. I find Jan's accounting, in this instance, to be credible and therefore conclude that this disbursement was properly made.

2. April 7, 2006 disbursement of $10,000 from the MFLT. In support of this disbursement, the Defendants provide twelve checks issued by Jan personally to Flora and Martin Maue in 2004. *See* Defs.' Ex. 2, Tab 2. Defendants did not present any accountings from the MFLT. The checks total $12,775, which does not directly match the $10,000 disbursement in 2006 and appears to be an after-the-fact attempt to justify an improper distribution. Martin credibly testified that he never authorized Jan to disburse money to himself as reimbursement for any asserted financial obligations owed. I therefore conclude that this disbursement was improper and that the Defendants should be surcharged in the amount of **$10,000**.

3. May 4, 2006 disbursement of $2,500 from the MFLT. In support of this disbursement, the Defendants provide two checks issued by Jan personally to Martin and Flora Maue in 2004 in the amount of $2,500. *See* Defs.' Ex. 2, Tab 3. Although Defendants generally assert that the May 4, 2006 disbursement was a reimbursement for these checks, they do not provide any insight as to why this was proper. Defendants did not present any accountings from the MFLT. Furthermore, Martin credibly testified that he never authorized Jan to reimburse himself from Martin's share of the MFLT. I therefore conclude that this disbursement was improper and that the Defendants

should be surcharged in the amount of **$2,500**.

4. June 1, 2006 disbursement of $5,000 from the RMMT. In support of this disbursement, the Defendants provide a collection of receipts and checks, some of them totally illegible. *See* Defs.' Ex. 2, Tab 4. Defendants assert in their late-filed accounting that the disbursement was a reimbursement for trust expenses. *See* Pls.' Ex. 171. This collection of checks and receipts do not exactly match the amount disbursed to Defendants and appear to be an after-the-fact attempt to justify an improper distribution. They are insufficient to satisfy the Defendants' burden to demonstrate that they were proper trust expenditures. I therefore conclude that this disbursement was improper and that the Defendants should be surcharged in the amount of **$5,000**.

5. August 29, 2006 disbursement of $5,000 from the MFLT. In support of this disbursement, the Defendants provide a collection of checks made to Martin, Flora and Michael Barber, the private investigator assertedly involved with the Keating Litigation. *See* Defs.' Ex. 2, Tab 5. The checks were issued in the years 2004 through 2006 and do not exactly match the $5,000 disbursed to the Defendants and appear to be an after-the-fact attempt to justify an improper distribution. The Defendants did not present any accountings from the MFLT. Martin credibly testified that he never authorized Jan to disburse money to himself as reimbursement for any asserted financial obligations owed. Craig credibly testified that he separately paid Jan back for any debts owed in connection with the Keating Litigation and that he did not authorize Jan to disburse money to himself in payment for an asserted debt owed. I therefore conclude that this disbursement was improper and that the Defendants should be surcharged in the amount of **$5,000**.

6. August 1, 2007 disbursement of $13,000 from the MFLT. In support of this disbursement, the Defendants provide checks issued by Jan to Spector Gadon & Rosen, counsel for Craig in the Keating Litigation. *See* Defs.' Ex. 2, Tab 6. Defendants did not present any accountings from the MFLT. The Defendants appear to concede that this was an improper expenditure as Defendants' expert witness, Micah Pilgrim, indicated during oral testimony that it was improper to pay an

expense related to the Keating Litigation from trust funds. Craig credibly testified that he separately paid Jan back for any debt owed in connection with the Keating Litigation and that he did not authorize Jan to disburse money to himself in payment for any asserted debts owed. I therefore conclude that this disbursement was improper and that the Defendants should be surcharged in the amount of **$13,000**.

7. October 4, 2007 disbursement of $6,466.02 from the MFLT. In support of this disbursement, the Defendants provide a collection of checks and statements. *See* Defs.' Ex. 2, Tab 7. The Defendants did not present any accountings from the MFLT. Moreover, Mr. Pilgrim indicated during oral testimony that $3,454.24 of this disbursement was improper as it related to the Keating Litigation. The collection of checks and statements do not exactly match the amount disbursed to Defendants and appear to be an after-the-fact attempt to justify improper distributions. They are insufficient to satisfy the Defendants' burden to demonstrate that they were proper trust expenditures. I therefore conclude that this disbursement was improper and that the Defendants should be surcharged in the amount of **$6,466.02**.

8. June 12, 2008 disbursement of $50,000 from the RMMT. The Defendants assert that this was a reimbursement for legal bills paid in connection with the Keating Litigation. *See* Defs.' Ex. 2, Tab 8. The Defendants appear to concede that this was an improper expenditure as Mr. Pilgrim indicated during oral testimony that this disbursement was improper as it related to the Keating Litigation. The Defendants late-filed accounting incorrectly provides that this was a distribution made to Craig. *See* Pls.' Ex. 190. I therefore conclude that this disbursement was improper and that the Defendants should be surcharged in the amount of **$50,000**.

9. November 21, 2008 disbursement of $20,000 from the MFLT. The Defendants assert that this disbursement was a distribution to Jan from the MFLT. *See* Pilgrim Report, Defs.' Ex. 1, pg. 10. The Defendants did not present any accountings from the MFLT and they do not otherwise indicate for what purpose this asserted distribution was made. I therefore conclude that this disbursement

was improper and that the Defendants should be surcharged in the amount of **$20,000**.

10. May 28, 2010 disbursement of $32,000 from the RMMT. In support of this disbursement, the Defendants provide a collection of checks and statements, some of them barely legible, asserting that the disbursement was a reimbursement for trust expenses. *See* Defs.' Ex. 2, Tab 10. This disbursement is inconsistent with the late-filed accounting, which indicates that $52,000 was reimbursed to Jan for "long term liabilities." *See* Pls.' Ex. 217. The collection of checks and statements do not exactly match the amount disbursed to Defendants and appear to be an after-the-fact attempt to justify an improper distribution. They are insufficient to satisfy the Defendants' burden to demonstrate that they were proper trust expenditures. I therefore conclude that this disbursement was improper and that the Defendants should be surcharged in the amount of **$32,000**.

11. November 22, 2010 disbursement of $30,000 from the RMMT. The Defendants assert that this was a reimbursement for legal bills paid in connection with the Keating Litigation. *See* Defs.' Ex. 2, Tab 11. The Defendants appear to concede that this was an improper expenditure as Mr. Pilgrim indicated during oral testimony that this disbursement was improper as it related to the Keating Litigation. The Defendants' late-filed accounting incorrectly provides that this was a distribution made to Craig. *See* Pls.' Ex. 217. I therefore conclude that this disbursement was improper and that the Defendants should be surcharged in the amount of **$30,000**.

12. March 16, 2011 disbursement of $5,000 from the RMMT. In support of this disbursement, the Defendants provide a collection of checks and receipts, some of them barely legible, asserting that the disbursement was a reimbursement for trust expenses. *See* Defs.' Ex. 2, Tab 12. The collection of checks and receipts do not exactly match the amount disbursed to Defendants and appear to be an after-the-fact attempt to justify an improper distribution. They are insufficient to satisfy the Defendants' burden to demonstrate that they were proper trust expenditures. I therefore conclude that this disbursement was improper and that the Defendants should be surcharged in the amount

of **$5,000**.

13. January 31, 2012 disbursement of $15,000 from the RMMT. In support of this disbursement, the Defendants provide a collection of letters, statements and check duplicates, asserting that the disbursement was a reimbursement for trust expenses and that the $15,000 was no longer part of any trust. *See* Defs.' Ex. 2, Tab 13. The late-filed accounting for the RMMT does not disclose any disbursement to Defendants. *See* Pls.' Ex. 263. A statement from Merrill Lynch confirms that this disbursement was made from the RMMT, directly contradicting Defendants' assertion that the reimbursement came from funds no longer part of the RMMT. *See* Pls. Ex. 259, pg. 2602. I therefore conclude that this disbursement was improper and that the Defendants should be surcharged in the amount of **$15,000**.

14. March 1, 2012 disbursement of $20,000 from the RMMT. In support of this disbursement, the Defendants provide a collection of letters, asserting that the disbursement was reimbursement for various expenses and loans to Martin. *See* Defs. Ex. 2, Tab 14. The late-filed accounting incorrectly and inconsistently labels this disbursement as a $11,000 distribution to Martin "for Najjar and legal expenses." *See* Pls.' Ex. 263. It appears that the Defendants disbursed $20,000 to themselves, brazenly accounting for it as a distribution to Martin for legal expenses, although the expense was incurred by Defendants defending litigation in California that was unrelated to the RMMT. Martin credibly testified that he never authorized Jan to disburse money to himself as reimbursement for any asserted financial obligations owed by him to Jan. I therefore conclude that this disbursement was improper and that the Defendants should be surcharged in the amount of **$20,000**.

15. August 14, 2013 disbursement of $15,000 from the RMMT. In support of this disbursement, the Defendants provide a collection of letters, asserting that the disbursement was reimbursement for various expenses and loans to Martin. *See* Defs. Ex. 2, Tab 15. The late-filed accounting incorrectly and inconsistently labels this disbursement as a $14,283.48 distribution to Jan "for the

benefit of Martin." *See* Pls.' Ex. 285. It therefore appears that the Defendants disbursed $15,000 to themselves, brazenly accounting for it as a distribution for Martin's benefit for legal expenses, although the expense was incurred by Defendants while defending litigation in California that was unrelated to the RMMT. Martin credibly testified that he never authorized Jan to disburse money to himself as reimbursement for any asserted financial obligations owed. I therefore conclude that this disbursement was improper and that the Defendants should be surcharged in the amount of **$15,000**.

16. April 17, 2014 disbursement of $70,000 from the RMMT. The Defendants assert that the $70,000 disbursement was "paid to Jan as his quarter share of the $300,000 distribution to Howard in 2010. *See* Defs.' Ex. 2, Tab 16. Mr. Pilgrim states in his report that the distribution was "a reserve to settle interfamily debts from the RMMT. We understand that each sibling had a share of the distribution and Jan's portion was $70,000." *See* Pilgrim Report, Defs.' Ex. 1, pg. 10. Jan did not timely disclose the $70,000 disbursement and it does not appear that any similar distribution was made to the other beneficiaries. I therefore conclude that this disbursement was improper and that the Defendants should be surcharged in the amount of **$70,000**.

17. April 25, 2014 disbursement of $143,891 from the RMMT. In support of this disbursement, the Defendants provide a collection of spreadsheets, statements and checks, which consist of nearly 150 pages, asserting that the disbursement was a reimbursement for interfamily debts. *See* Defs.' Ex. 2, Tab 17. The Defendants appear to concede that approximately $91,205 was improperly disbursed to Defendants as the amount related to litigation brought in connection with the Howard Maue Irrevocable Gift Trust. *See* Defs.' Amended Proposed Findings of Fact and Conclusions of Law, Dkt. No. 94-1, pg. 14. The late-filed interim accounting does not provide for a corresponding disbursement, although it does appear to improperly provide for a distribution to Jan "for the benefit of Martin" for $49,000 and for a distribution to Jan "for the benefit of Craig" for $71,167.92. Other than the inconsistent and late-filed accounting, the Defendants did not disclose

the disbursement to the other beneficiaries. Furthermore, Jan wrote Howard an email about trust matters on the day prior to this disbursement and failed to disclose that he would be taking significant distributions from the RMMT. *See* Pls.' Ex. 91. The Defendants have failed to meet their burden to demonstrate that this was a proper trust disbursement. I therefore conclude that the disbursement that the Defendants should be surcharged in the amount of **$143,891**.

18. April 30, 2014 disbursement of $141,416 from the MPT. The Defendants assert that this disbursement was an interest-only loan, with an interest rate of 3.25%. *See* Defs.' Ex. 2, Tab 18. At trial, it became clear that the Defendants did not sign and could not provide any loan documents in connection with this disbursement. The asserted interest rate for the loan was more favorable to the Defendants than the interest rates charged to other beneficiaries. Furthermore, other than the late-filed accounting, it does not appear that the Defendants disclosed the "loan" to, or requested permission from, the beneficiaries. I therefore conclude that this disbursement was improper and that the Defendants should be surcharged in the amount of $**141,416**.

19. May 19, 2014 disbursement of $3,668 from the MPT. In support of this disbursement, the Defendants provide a statement from what appears to be a personal bank account, containing hand marked notations indicating which expenses were for trust purposes. *See* Defs.' Ex. 2, Tab 19. The expenses on the bank statement do not exactly match the amount disbursed to Defendants and appear to be an after-the-fact attempt to justify an improper distribution. They are insufficient to satisfy the Defendants' burden to demonstrate that they were proper trust expenditures. I therefore conclude that this disbursement was improper and that the Defendants should be surcharged in the amount of **$3,668**.

20. May 19, 2014 disbursement of $992.60 from the MPT. In support of this disbursement, the Defendants provide a collection of spreadsheets, statements and receipts, asserting that the disbursement was a reimbursement for various trust expenses in 2014. *See* Defs.' Ex. 2, Tab 20. The amounts reflected in these documents do not exactly match the amount disbursed to the

Defendants and appear to be an after-the-fact attempt to justify an improper distribution. They are insufficient to satisfy the Defendants' burden to demonstrate that they were proper trust expenditures. I therefore conclude that this disbursement was improper and that the Defendants should be surcharged in the amount of **$992.60**.

21. February 12, 2016 disbursement of $220,000 from the MPT. In support of this disbursement, the Defendants provide nearly 1500 pages of spreadsheets, receipts and checks dating back to 1991, asserting that the disbursement was repayment for "long term liabilities" owed to Jan. *See* Defs.' Ex. 2, Tab 21; Pilgrim Report, Defs.' Ex. 1, pg. 10. Jan initiated this disbursement after the May 12, 2014 letter from Brian McNamara, who was retained by Howard, asking for an accounting and for Jan to resign as trustee. *See* Pls.' Ex. 101. The documents provided by the Defendants are insufficient to satisfy the Defendants' burden to demonstrate that they were proper trust expenditures. I therefore conclude that this disbursement was improper and that the Defendants should be surcharged in the amount of **$220,000**.

22. February 17, 2016 disbursement of $2,884 from the MPT. In support of this disbursement, the Defendants provide a barely legible check duplicate which indicates that the payment to Jan was "for repairs." *See* Pls.' Ex. 428. The check duplicate is insufficient to satisfy Defendants' burden to demonstrate that the disbursement was a proper trust expenditure. I therefore conclude that this disbursement was improper and that the Defendants should be surcharged in the amount of **$2,884**.

23. March 16, 2016 disbursement of $2,596.93 from the MPT. In support of this disbursement, the Defendants provide a check duplicate which indicates that the payment to Jan was for "Condo Prep & Repairs." *See* Pls.' Ex. 428. The check duplicate is insufficient to satisfy Defendants' burden to demonstrate that the disbursement was a proper trust expenditure. I therefore conclude that this disbursement was improper and that the Defendants should be surcharged in the amount of **$2,596.93**.

24. March 25, 2016 disbursement of $2,166.08 from the RMMT. In support of this disbursement, the

Defendants provide a check issued to Jan "for Hearing Expenses." A notation next to the check indicates that the check was repayment for legal bills. *See* Defs.' Ex. 2, Tab 22. The accounting inconsistently states that this check was repayment for travel expenses. *See* Pls.' Ex. 373. The Defendants did not meet their burden to demonstrate that this disbursement was a proper trust expenditure. I therefore conclude that this disbursement was improper and that the Defendants should be surcharged in the amount of **$2,166.08**.

25. April 7, 2016 disbursement of $66,285 from the MPT. The Defendants assert that this disbursement was payment for 17 years of trustee fees on account of services provided to the MPT. *See* Defs.' Ex. 2, Tab 23. For the reasons articulated earlier, I find that Jan's conduct surrounding the Trusts amount to a breach of trust and that Jan willfully engaged in bad faith conduct with respect to much of his management of the Trusts. It is therefore appropriate for the Plaintiffs to disgorge the asserted fees and I will order an additional surcharge in the amount of **$66,285**.

26. April 21, 2017 disbursement of $3,060.86 from the RMMT. In support of this disbursement, the Defendants provide a collection of spread sheets and statements and a check made out to "Jan G Maue, Trustee" for "Manager RE Agent Cancelled Hearing." *See* Defs.' Ex. 2, Tab 24. It does not appear that the Defendants gave an accounting for 2017. Furthermore, the collection of spreadsheets and statements are insufficient to satisfy the Defendants' burden to demonstrate that the disbursement was for a proper trust expenditure. I therefore conclude that the disbursement was improper and that the Defendants should be surcharged in the amount of **$3,060.86**.

27. October 12, 2017 disbursement of $10,000 from the RMMT. In support of this disbursement, the Defendants provide statements and receipts, asserting that the disbursement was repayment for trust expenses. *See* Defs.' Ex. 2, Tab 25. It does not appear that the Defendants provided an accounting for 2017. Furthermore, the collection of statements and receipts are insufficient to satisfy the Defendants' burden to demonstrate that the disbursement was for a proper trust expenditure. I therefore conclude that the disbursement was improper and that the Defendants

should be surcharged in the amount of **$10,000**.

28. October 27, 2017 disbursement of $2,500 from the MPT. In support of this disbursement, the Defendants provide a barely legible check duplicate which indicates that the payment to Jan was for special assessments. *See* Pls.' Ex. 428. It does not appear that the Defendants gave an accounting for 2017. The check duplicate is insufficient to satisfy Defendants' burden to demonstrate that the disbursement was a proper trust expenditure. I therefore conclude that this disbursement was improper and that the Defendants should be surcharged in the amount of **$2,500**.

29. May 29, 2018 disbursement of $5,065.95 from the MPT. In support of this disbursement, the Defendants provide a check duplicate which indicates that the payment to Jan was for tax preparation for the years 2014 through 2016. *See* Pls.' Ex. 428. It does not appear that the Defendants gave an accounting for 2018. The check duplicate is insufficient to satisfy Defendants' burden to demonstrate that the disbursement was a proper trust expenditure. I therefore conclude that this disbursement was improper and that the Defendants should be surcharged in the amount of **$5,065.95**.

30. May 30, 2018 disbursement of 6,836.36 from the MPT. In support of this disbursement, the Defendants provide a barely legible check duplicate which appears to indicate that the payment to Jan was for repairs related to the MPT. *See* Pls.' Ex. 428 It does not appear that the Defendants gave an accounting for 2018. The check duplicate is insufficient to satisfy Defendants' burden to demonstrate that the disbursement was a proper trust expenditure or that the funds were actually used for the benefit of the MPT. I therefore conclude that this disbursement was improper and that the Defendants should be surcharged in the amount of **$6,836.36**.

Based on the above, the amount of funds improperly disbursed to Defendants, as a result of a breach of Jan's fiduciary duties, totals **$905,328.80**.[11]

---

[11] This figure is $5,000 less than the actual subtotal of the various improper disbursements to Jan. It appears from Plaintiffs' Proposed Findings of Fact and Conclusions of Law that Plaintiffs concede that $5,000 was properly disbursed. *See* Dkt. No. 97-1, pg. 28. I construe this as a concession by Plaintiffs that this amount was properly disbursed.

Disbursements to Attorneys

As provided in Table B, from the years 2014 through 2018, Jan disbursed money from the Trusts to pay various legal expenses. The disbursements consist of payments to three firms: the Beliveau Law Group in the amount of $10,000, the Law Offices of Brantley Oakey in the amount of $6,000; and Lindsay & Allen in the amount of $116,094.98. Jan testified at trial that he did not provide legal invoices to the Plaintiffs regarding these payments, nor were any such invoices submitted at trial.

With respect to the payment to Beliveau Law Group, Jan testified that he retained the firm to initiate guardianship proceedings against Howard. He further testified that he retained Beliveau Law Group at a time when Howard was initiating proceedings to have Jan removed as trustee from the Howard Maue Trust and around the same time that Howard disinherited Jan from the will. Jan's testimony that he retained Beliveau Law Group for Howard's own benefit lacks credibility and I find that this expenditure did not relate to administration of the RMMT. I therefore conclude that the payment to Beliveau Law Group was an improper trust expenditure.

With respect to the payments to Brantley Oakey, the Defendants did not provide any evidence that these expenditures were related to the MPT. The Defendants, therefore, have not met their burden in showing that the disbursements to Brantley Oakey were proper trust expenditures.

Lastly, with respect to the payments to Lindsay & Allen, Jan testified that the firm was retained to initiate a civil defamation lawsuit against Cristi and to defend the breach of trust lawsuit brought against him by his siblings. Jan could not sufficiently clarify which of the payments to Lindsay & Allen pertained to which lawsuit and admitted that he did not provide the necessary invoices to the Plaintiffs. For this specific reason, the Defendants have not demonstrated that the payments to Lindsay & Allen were appropriate trust expenditures. Moreover, to the extent the payments to Lindsay & Allen were related to Jan's state-law defense for breach of trust, I conclude the funds should be disgorged given my finding that Jan breached his fiduciary duties and that Jan administered the Trusts in bad

faith. *See e.g.*, *Kritchman v. Wolk*, 152 So. 3d 628 (Fla. 3d DCA 2014); *McCormick v. Cox*, 118 So. 3d 980 (Fla. 3d DCA 2013).

For these reasons, I conclude that the Defendants should be surcharged for the improper payment of legal fees in the amount of **$132,094.98**.

<u>Disbursements to Boston Company</u>

As provided in Table C, Jan disbursed $100,000 to Boston Company in four separate payments. At trial, Jan testified that he believed the funds went to Howard. The Defendants did not provide any other evidence or support to indicate that the disbursements were in fact for Howard or for any other trust purpose. The Defendants, therefore, failed to demonstrate that the disbursements to Boston Company were proper trust expenditures and they should be surcharged in the amount of **$100,000**.

<u>2013 MPT Tax Return</u>

Plaintiffs seek to impose a surcharge in the amount of $89,000 based on an asserted 2013 MPT tax refund paid to Jan. The MPT tax return for 2013 indicates that there was an over payment of $89,252 which was to be refunded. *See* Pls.' Ex. 304. The tax return was dated and signed on April 16, 2018. *Id*. Jan testified that he did not receive any such refund. Plaintiffs have not provided any evidence, beyond the existence of a signed tax return, that the Defendants received and took possession of tax related funds owed to the MPT. Furthermore, the Plaintiffs' own expert witness, Harold McFarland, testified that he has not seen any documentation indicating that the asserted refund has been received and that "given [his] experience, that may be normal that it has not yet been received." As explained earlier, a trustee in Florida that fails to keep proper records has the burden to demonstrate that all expenses were proper and incurred for the benefit of the trust. However, in this instance, where the Plaintiffs have not established that Jan actually received the money, it would be improper to allocate the burden of proof to the Defendants. I therefore conclude that the Plaintiffs have not met their burden, as it relates to this asserted tax refund, in demonstrating that a breach of trust occurred and that it resulted in injury.

RMMT Distribution to Howard

Plaintiffs seek to impose a surcharge in the amount of $85,000 for a distribution to Howard from the RMMT in 2009. *See* Pls.' Ex. 198. Howard was a beneficiary of the RMMT. The RMMT gave Jan the discretion to disburse to Howard an amount which Jan deemed necessary for Howard's support. At trial, it became evident that Howard was not only a fruitful provider for the family, but a powerful figure in the lives of both the Plaintiffs and the Defendants. The Plaintiffs have not shown that this disbursement to Howard was unreasonable or that it otherwise constitutes a breach of trust.

Total Amount to be Surcharged

Under Florida law, when a beneficiary has received too much or too little as a result of a breach of trust, the court has discretion to determine the appropriate amount that should be restored to either the trust or the beneficiaries. Fla. Stat. § 736.1001 provides in relevant part:

> As an illustration of the remedies available to the court and without limiting the court's discretion as provided in subsection (2), *if a breach of trust results in the favoring of any beneficiary to the detriment of any other beneficiary* or consists of an abuse of the trustee's discretion:
> (a) To the extent the breach of trust has resulted in no distribution to a beneficiary or a distribution that is too small, *the court may require the trustee to pay from the trust to the beneficiary an amount the court determines will restore the beneficiary, in whole or in part, to his or her appropriate position.*
> (b) To the extent the breach of trust has resulted in a distribution to a beneficiary that is too large, *the court may restore the beneficiaries, the trust, or both, in whole or in part, to their appropriate positions* by requiring the trustee to withhold an amount from one or more future distributions to the beneficiary who received the distribution that was too large or by requiring that beneficiary to return some or all of the distribution to the trust.

Fla. Stat. § 736.1001(3) (emphases added).

As a result of Jan's breach of trust, the Defendants received a disproportionate share of trust funds, far more than they would have otherwise received on account of Jan's interest as a beneficiary. Conversely, the Plaintiffs were deprived of the fair share of trust funds that they were entitled to as beneficiaries. As discussed *infra*, it is in the

best interest of the parties to fully administer and distribute all remaining trust property to the beneficiaries so that the parties are able to move forward with their lives.  To this end, the parties would not benefit from any relief that requires the Defendants to pay a surcharge back to the Trusts.  I therefore conclude that payment of the surcharge should go directly to the Plaintiffs.

I have calculated the total amount of the surcharge of improperly disbursed funds to be **$1,137,423.78**.  In normal circumstances, I would require this money to be paid back to the Trusts to be distributed in accordance with their terms. However, as the Plaintiffs appropriately seek judgment directly in their favor, this amount should be reduced by 25%, which represents Jan's interest as a beneficiary.  Therefore, the amount of the surcharge to be paid to Plaintiffs is **$853,067.84**.[12]

## C. Dischargeability

A creditor objecting to the dischargeability of its claim bears the burden of proving, by a preponderance of the evidence, that the particular debt falls within one of the exceptions to discharge enumerated in § 523(a).  *Grogan v. Grogan*, 498 U.S. 279, 291 (1991).

§ 523(a)(2)(A)

The Plaintiffs assert that the Defendants' debt is exempt from discharge under § 523(a)(2)(A) based on the Defendants' material nondisclosures which allowed them to wrongfully disburse funds from the Trusts.  In the Ninth Circuit, a creditor's claim of nondischargeability under § 523(a)(2)(A) must establish five elements: (1) misrepresentation, fraudulent omission or deceptive conduct by the debtor; (2) knowledge of the falsity or deceptiveness of his statement or conduct; (3) an intent to deceive; (4) justifiable reliance by the creditor on the debtor's statement or conduct; and (5) damage to the creditor

---

[12] I note that Plaintiffs indicated that Martin is "entitled to an unapportioned amount of $145,000 for his portion of the disbursement from MPT misappropriated by Jan."  *See* Dkt. No. 97-1, pg. 26. To the extent Plaintiffs wish to allocate the total judgment amount based on the disproportionate shares of trust funds already received by the Plaintiffs, they may do so in an agreed to form of order.

proximately caused by its reliance on the debtor's statement or conduct. *Turtle Rock Meadows Homeowners Ass'n v. Slyman (In re Slyman)*, 234 F.3d 1081, 1085 (9th Cir. 2000).

The Plaintiffs contend that they are able to prove all elements required under § 523(a)(2)(A) despite difficulty proving reliance and causation. In support, Plaintiffs argue that the nondisclosure of a material fact has been held to establish the requisite elements of reliance and causation for actual fraud under the Bankruptcy Code, citing *Apte v. Japra (In re Apte)*, 96 F.3d 1319, 1324 (9th Cir. 1996).

Although I agree with the Plaintiffs as to the legal proposition raised, their analysis does not fully address the issue. "Section 523(a)(2)(A) does not except from discharge 'any debt for false pretenses, a false representation or actual fraud.' Rather it excepts from discharge 'any debt for money, property, services, or an extension, renewal, or refinancing of credit, *to the extent obtained* by false pretenses, a false representation, or actual fraud[.]" *Whittaker v. Whittaker (In re Whittaker)*, 564 B.R. 115, 138 (Bankr. D. Mass. 2017) (emphases altered). Here, even if there were material nondisclosures, the Plaintiffs do not establish that the Defendants *obtained* money by false pretenses, a false representation, or actual fraud, only that the nondisclosures enabled the Defendants to conceal disbursements that already occurred. Jan, as trustee, had legal authority to transfer money out of the Trusts, including to himself. The fact that Jan breached various fiduciary duties, including the failure to account, is not sufficient to determine that the debt is nondischargeable under § 523(a)(2)(A).

§ 523(a)(4)

The Plaintiffs assert that the Defendants' debt is exempt from discharge under § 523(a)(4) on grounds of both defalcation and embezzlement. In the Ninth Circuit, a debt is excepted from discharge under § 523(a)(4) where "1) an express trust existed, 2) the debt was caused by fraud or defalcation, and 3) the debtor acted as a fiduciary to the creditor at the time the debt was created." *Otto v. Niles (In re Niles)*, 106 F.3d 1456, 1459 (9th Cir. 1997) (quoting *Klingman v. Levinson*, 831 F.2d 1292, 1295 (7th Cir. 1987)). "[T]he fiduciary relationship must be one arising from an express or technical trust that was imposed before and without reference to the wrongdoing that caused the debt." *Lewis v. Scott (In re*

*Lewis*), 97 F.3d 1182, 1185 (9th Cir. 1996) (citing *Ragsdale v. Haller*, 780 F.2d 794, 796 (9th Cir. 1986)); *Davis v. Aetna Accept. Co.*, 293 U.S. 328, 333 (1934). Courts look to state law to determine whether the requisite trust relationship exists. *Lewis*, 97 F.3d at 1185.

Here, there is no dispute that an express trust existed under Florida law and that Jan was a fiduciary to the Plaintiffs at the time the debt was created. Therefore, the only element in dispute is whether the debt was caused by fraud or defalcation.

Defalcation has been defined as the "misappropriation of trust funds or money held in any fiduciary capacity; [the] failure to properly account for such funds." *Id*. at 1186 (quoting Black's Law Dictionary 417 (6th ed. 1990)). "To prove defalcation, a creditor must establish a 'culpable state of mind… involving knowledge of, or gross recklessness in respect to, the improper nature of the relevant fiduciary behavior.'" *Campbell v. Spencer (In re Spencer)*, 752 Fed. Appx. 510, 511 (9th Cir. 2019) (quoting *Bullock v. BankChampaign, N.A.*, 569 U.S. 267, 269 (2013)). More specifically, the state of mind required for defalcation includes not only bad faith, moral turpitude and immoral conduct, but other intentional wrongdoing, such as "conduct the fiduciary knows is improper" or conduct where the fiduciary "consciously disregards (or is willfully blind to) a substantial and unjustifiable risk that his conduct will turn out to violate a fiduciary duty." *Bullock*, 569 U.S. at 273-274 (internal quotation marks omitted) (citation omitted). Put another way, the unjustifiable risk taken by a fiduciary "must be of such a nature and degree that, considering the nature and purpose of the actor's conduct and the circumstances known to him, its disregard involves a *gross deviation* from the standard of conduct that a law-abiding person would observe in the actor's situation." *Id*. at 274 (quoting ALI, Model Penal Code § 2.02(2)(c), p. 226 (1985)). Unlike embezzlement and larceny, defalcation "can encompass a breach of [a] fiduciary obligation that involves neither conversion, nor taking and carrying away another's property, nor falsity." *Id*. at 275 (citation omitted). Furthermore, defalcation "may be used to refer to *nonfraudulent* breaches of fiduciary duty." *Id*. (citation omitted).

To prevail on an embezzlement claim under § 523(a)(4), a creditor must prove three elements: (1) property rightfully in the possession of a nonowner; (2) the nonowner's appropriation of the property to use other than that for which it was entrusted; and (3) circumstances indicating fraud. *Transamerica Commercial Fin. Corp. v. Littleton (In re Littleton)*, 942 F.2d 551, 555 (9th Cir. 1991).

As discussed earlier, Jan breached a multitude of his fiduciary duties as trustee of the Trusts. To determine whether these breaches should result in a determination of nondischargeability under § 523(a)(4), I will address specific instances of Jan's conduct independently.

*Disbursements to Jan*

I determined earlier that Jan, under Florida law, improperly disbursed to himself $905,328.80. After accounting for Jan's 25% beneficial interest, these disbursements constitute $678,996.60 of the underlying state law surcharge.

The actions underlying Jan's breach of trust, as it relates to disbursements made to himself, were done with the requisite state of mind to constitute defalcation under § 523(a)(4). Although I previously found that Jan acted in bad faith, the disbursements made to himself, at the very least, were done with conscious disregard of a substantial and unjustifiable risk that his conduct would violate his fiduciary duties. Furthermore, I find that Jan's actions were a gross deviation from the actions that an ordinary law-abiding citizen in Jan's position would take. For years, Jan neglected to keep adequate records and to issue proper accountings. Jan disbursed trust funds to himself to pay back asserted debts owed to him by the Plaintiffs, without their knowledge or consent, which effectively prevented the Plaintiffs from raising any potential state law defenses to Jan's asserted claims. Jan took excessive distributions without contemporaneously notifying the other beneficiaries in an act of blatant impartiality to himself. After being confronted by the other beneficiaries in 2014, Jan continued to improperly disburse funds to himself without regard to the interests of the Plaintiffs. Upon being faced with state court litigation for breach of trust, Jan rendered after-the-fact accountings which mischaracterized and concealed the nature of the disbursements made to himself. For these reasons, I conclude that the underlying surcharge in the amount

of **$678,996.60** is nondischargeable under § 523(a)(4).[13]

*Disbursements to Attorneys*

I determined earlier that Jan, under Florida law, improperly disbursed $132,094.98 to three different law firms. To determine whether the disbursements constitute defalcation or embezzlement under § 523(a)(4), I look at the nature of each expenditure independently.

As discussed earlier, Jan retained Beliveau Law Group to initiate guardianship proceedings against Howard. The retention of Beliveau Law Group was not related to trust business. Although Jan testified that he retained the firm for Howard's benefit, this testimony lacks credibility, and demonstrates an improper intent, as Jan initiated the guardianship proceedings during the same time period in which Howard sought to remove Jan as trustee from the Howard Maue Trust, and, also, in a time period in which Howard disinherited Jan from his will. Jan paid Beliveau Law Group with funds from the RMMT in bad faith and with conscious disregard to his duties as trustee, and I therefore conclude that Jan's action with respect to the payment constitutes defalcation.[14] After accounting for Jan's 25% beneficial interest, the disbursement to Beliveau Law Group constitutes **$7,500** of the underlying state law surcharge. I conclude that this amount is nondischargeable under § 523(a)(4).

With respect to the payments to Brantley Oakey, the Defendants did not provide any evidence that these expenditures were related to the MPT. Although these payments, which amount to $6,000, were part of the surcharge as the Defendants did not sufficiently account for the nature of the expense, the Plaintiffs have not shown the necessary scienter element to prove defalcation or embezzlement. Having reviewed the record, it is not clear for what purpose Brantley Oakey was retained. Neither the briefing nor my review of the testimony provided any clarity on the issue. I acknowledge that the Defendants failure to account for trust expenditures, especially when those specific expenditures have

---

[13] Since I have determined that Jan's conduct constitutes defalcation under § 523(a)(4), I will not analyze whether his conduct also constitutes embezzlement.
[14] Since I have concluded that this action constitutes defalcation under § 523(a)(4), I will not analyze whether it also constitutes embezzlement.

MEMORANDUM DECISION - 38

been put at issue in this proceeding, is probative of an improper intent. However, in this instance, beyond Jan's mere failure to account, there is no evidence that this expenditure was made with the necessary intent to constitute defalcation or embezzlement. The Plaintiffs, therefore, have failed to prove this portion of the surcharge should be nondischargeable.

Whether the payments to Lindsay & Allen constitute defalcation is a closer call. At trial, Jan acknowledged that he did not provide the Plaintiffs with invoices for most of the payments to Lindsay & Allen. Jan testified that in addition to defending him in the breach of trust lawsuit, Lindsay & Allen was also retained in a civil defamation lawsuit brought against Cristi. Jan testified that he believed all payments to Lindsay & Allen with respect to the defamation lawsuit were segregated and paid for by him individually, not from trust funds. However, this testimony is not believable and I find that it is more likely than not that Jan mixed these expenditures together and some portion of the disbursements to Lindsay & Allen did not relate to administration of the Trusts. However, the Plaintiffs have the burden to prove that particular debts fall within an exception to discharge and, here, I am unable to determine, based on the record provided, the amount of the disbursements to Lindsay & Allen which pertained to the defamation lawsuit.

As for payments to Lindsay & Allen for the defense of the breach of trust lawsuit, I conclude that these actions do not constitute defalcation or embezzlement. Even though the breach of trust lawsuit alleged bad faith, the hiring of defense counsel by Jan clearly relates to his administration of the Trusts. The terms of the Trusts allowed Jan to hire professionals and the Florida Trust Code permits the initial payment of legal fees in connection with the defense of a breach of trust lawsuit brought against a trustee. *See* Fla. Stat. § 736.0802(10)(b). Even though I determined that Jan breached his fiduciary duties and imposed a surcharge in the amount of all fees paid to Lindsay & Allen, I do not believe such findings meet the necessary scienter requirements to render the debt nondischargeable under § 523(a)(4). The act of paying Lindsay & Allen, in itself, does not demonstrate bad faith or conscious disregard for an unjustifiable risk that the payment would breach Jan's fiduciary duties. Similarly, embezzlement cannot

be established as there is no indicia of fraud. Since I am unable to determine which amounts paid to Lindsay & Allen pertained to the breach of trust, the Plaintiffs have not shown that any of the amounts should be nondischargeable under § 523(a)(6).

*Distributions to Boston Company*

I determined earlier that Jan, under Florida law, improperly disbursed $100,000 to Boston Company. Jan testified that these funds went to Howard. The Plaintiffs did not provide any evidence that contradicts Jan's testimony. Although these disbursements were improper under the Florida Trust Code, as Jan failed to provide adequate accountings and to meet his burden to show that they were proper trust expenditures, I conclude that Jan's actions did not constitute defalcation or embezzlement under § 523(a)(4). There is no evidence to suggest that Jan acted with the requisite intent to constitute defalcation in disbursing money to Boston Company. Similarly, there is absolutely no evidence that the funds were embezzled for Jan's benefit. I therefore conclude that Plaintiffs have not established that this portion of the debt should be nondischargeable under § 523(a)(4).

§ 523(a)(6)

Under § 523(a)(6), any debt "for willful and malicious injury by the debtor to another entity or property of another entity" is exempt from discharge. In the Ninth Circuit, the willful injury requirement is met when either the debtor has the subjective intent to inflict injury or when the debtor believes that injury is substantially certain to result from his or her conduct. *Carillo v. Su (In re Su)*, 290 F.3d 1140, 1142 (9th Cir. 2002). "The Debtor is charged with the knowledge of the natural consequences of his actions." *Ormsby v. First Am. Title Co. of Nev. (In re Ormsby)*, 591 F.3d 1199, 1206 (9th Cir. 2010) (citing *Cablevision Sys. Corp. v. Cohen (In re Cohen)*, 121 B.R. 267, 271 (Bankr. E.D.N.Y. 1990) and *In re Su*, 290 F.3d at 1146). A court is not required to take a debtor's word for his or her state of mind and the bankruptcy court may consider circumstantial evidence that tends to establish what the debtor must have known when taking the actions that caused injury. *In re Su*, 290 F.3d at 1146 n.6. The "malicious" injury requirement is separate and involves (1) a wrongful act; (2) done intentionally; (3) which

necessarily causes injury; and (4) is done without just cause or excuse. *In re Su*, 290 F.3d at 1146-47 (citing *Petralia v. Jercich (In re Jercich)*, 238 F.3d 1202, 1209 (9th Cir. 2001)). Malice may be inferred based on the nature of the wrongful act where willfulness has already been established. *In re Ormsby*, 591 F.3d at 1207.

*Disbursements to Jan*

The Plaintiffs seek a determination that the debt owed by Jan on account of improper disbursements made to himself is excepted from discharge for willful and malicious injury. In each circumstance in which Jan disbursed money to himself, he did so with the intent to injure the Plaintiffs as the actions, which Jan fully intended, naturally deprived the Plaintiffs of their share of trust funds they otherwise would have received. I therefore conclude that Jan's actions were willful. Furthermore, the injury was also malicious. As indicated earlier, Jan breached various fiduciary duties in disbursing money to himself without the knowledge or approval of the Plaintiffs. Jan's actions were wrongful and intentional and caused injury to the Plaintiffs. Despite Jan's attempt to render an after-the-fact accounting, the disbursements were without just cause of excuse. Accordingly, the portion of the underlying surcharge related to disbursements that Jan made to himself, which total **$678,996.60**, is excepted from discharge under § 523(a)(6).[15]

*Disbursements to Attorneys*

The Plaintiffs seek a determination that the Defendants' liability for disbursements made to attorneys is excepted from discharge for willful and malicious injury. To determine whether this portion of the surcharge should be nondischargeable under § 523(a)(6), I look to the nature of each expenditure independently.

As discussed earlier, the payment to Beliveau Law Group was not related to trust business, but rather, was used to initiate a guardianship proceeding against Howard. The guardianship proceeding

---

[15] I note that unlike nondischargeable debts under § 523(a)(4), debts found to violate § 523(a)(6) are dischargeable in a chapter 13 proceeding. *See* § 1328(a)(2).

was unrelated to the RMMT and was initiated around the same time that Howard sought to remove Jan as trustee from the Howard Maue Trust and around the same time that Howard disinherited Jan from his will. The injury was therefore willful as I am able to infer from circumstantial evidence that Jan intended to harm the other beneficiaries by distributing money to Believeau Law Group to advance his personal interests. The injury was also malicious. For the reasons described earlier, Jan's actions were wrongful and intentional and caused injury to the Plaintiffs. Jan's assertion that this expenditure was for Howard's benefit was not credible and I find that the money was disbursed without just cause or excuse. After accounting for Jan's 25% beneficial interest, the disbursement to Beliveau Law Group constitutes **$7,500** of the underlying state law surcharge. I conclude that this amount is nondischargeable under § 523(a)(6).

Like my determination under § 523(a)(4), the Plaintiffs have not shown that the portion of the underlying liability for disbursements to Brantley Oakey and Lindsay & Allen should be nondischargeable under § 523(a)(6). Beyond the mere failure to account for the disbursements to Brantley Oakey, the Plaintiffs did not highlight any evidence that suggests that Jan made this disbursement for a wrongful purpose or with the intent to inflict injury. With respect to the payments to Lindsay & Allen, for the reasons stated under the § 523(a)(4) analysis, I am unable to determine which portion of the underlying debt pertained to the civil defamation lawsuit against Cristi, which was unrelated to the Trusts and which would otherwise constitute a wrongful act. The payments to Lindsay & Allen for defense of the state law breach of trust action was not a wrongful action, within the context of § 523(a)(6), and I do not believe that Jan intentionally mixed the two expenditures together.

*Disbursement to Boston Company*

The Plaintiffs seek a determination that the Defendants' liability to them for disbursements made to Boston Company is excepted from discharge for willful and malicious injury. As indicated earlier, although Jan failed to timely account for these disbursements, Jan eventually did account and testified that the disbursements to Boston Company were made for Howard's benefit. The Plaintiffs have not shown

that Jan made the disbursements wrongfully or without just cause or excuse. The failure to account does not, in itself, demonstrate that the disbursements were wrongful and therefore malicious. The Plaintiffs have not shown that this portion of the underlying surcharge should be nondischargeable under § 523(a)(6).

Based on the above, the portion of the underlying state law surcharge that is nondischargeable under §§ 523(a)(4) and (a)(6) is **$686,496.60**.

**D. Affirmative Defenses and Counterclaims**

The Defendants raise various affirmative defenses and counterclaims. *See* Pretrial Order, Dkt. No. 86, pgs. 3-4. I address each one independently.[16]

*First Affirmative Defense – Waiver*

The Defendants assert that the Plaintiffs waived their right to receive accountings by refusing "to provide tax records, receipts and expense reports to Defendant so that a proper accounting could be produced." *Id*. Despite this assertion, the Defendants did not elicit, at trial, any evidence that the Plaintiffs refused to provide relevant documentation and that this refusal prevented Jan from issuing a proper accounting. Furthermore, it is unclear how the Plaintiffs could prevent Jan from producing a proper accounting when all evidence suggests that it was Jan who had access to the relevant information, i.e., how much money was disbursed from, and the amount of expenses incurred to, the Trusts. I therefore conclude that the Plaintiffs did not waive their right to an accounting.[17]

*Second Affirmative Defense – Waiver*

In a somewhat redundant second affirmative defense, the Defendants assert that the Plaintiffs waived their right to receive semi-annual accountings as the Plaintiffs agreed to an annual meeting format during family vacations. Martin testified that he was never given information on annual trust meetings

---

[16] The Defendants did not raise a laches or statute of limitations defense in either the Answer to the Amended Complaint or at trial. In Florida, the affirmative defense of laches or statute of limitations must be plead. *See* Fla. R. Civ. P. 1.110(d); 1.140(h). I therefore will not address those issues.

[17] I also note that the failure to account is but one of many fiduciary duties that Jan breached. Even if the Plaintiffs did in fact waive this right, it is unclear what effect, if any, that would have on the adjudication of the Plaintiffs' claims.

and that, for the most part, he was not even invited on family vacations. Similarly, Craig testified that he was only invited a few times. During those family vacations that Craig attended, including trips to Florida, British Columbia and the Caribbean, Craig testified that there was never a trust meeting. As indicated earlier, the family vacations, which were usually attended by Jan and Cristi, were not sufficient to fulfill Jan's duty to account, and the evidence presented does not support a finding that the Plaintiffs waived their right to be reasonably informed on trust administration.

*Third Affirmative Defense – Prudent Investor Rule*

The Defendants assert that Plaintiffs should be barred from any relief sought concerning alleged losses or damages related to investments and market fluctuations. *Id*. As the underlying liability did not relate to Jan's investment decisions or strategy, the third affirmative defense is inapplicable.

*Offset for Trustee Compensation and Reimbursement*

The Defendants assert that they are entitled to payment of all outstanding trustee fees and reimbursement for all personal expenses incurred in connection with the Trusts. I previously indicated that Jan was not entitled to trustee compensation in light of his bad faith actions and breaches of fiduciary duty. For the same reason I imposed a surcharge on all prior disbursements to Jan on account of asserted trustee compensation, I conclude that he is not entitled to further compensation as part of his counterclaims. Similarly, as discussed earlier, Jan has not met his burden to show that he is entitled to reimbursement from the Trusts for any further expenses incurred by him personally. I will therefore deny the Defendants any relief based on these asserted counterclaims.

**E. Injunctive Relief**

The Plaintiffs request that I enjoin the Defendants from taking any further actions regarding the Trusts and that I either suspend or remove Jan from his powers as trustee. As discussed earlier, I have jurisdiction under applicable nonbankruptcy law to grant the requested relief. The Florida Trust Code provides in relevant part that:

> To remedy a breach of trust that has occurred or may occur, the court may:
> (a) Compel the trustee to perform the trustee's duties;

(b) Enjoin the trustee from committing a breach of trust;
…
(e) Appoint a special fiduciary to take possession of the trust property and administer the trust;
(f) Suspend the trustee;
(g) Remove the trustee as provided in s. 736.0706;
…
(j) Order any other appropriate relief.

Fla. Stat. § 736.1001(2).

To prevent further breaches of trust, I find that it is appropriate to enjoin the Defendants from taking any further action regarding the Trusts, including the disbursement of funds and the payment of expenses. It is also appropriate to suspend Jan as trustee pending further clarification on whether a successor trustee should be appointed or whether the remaining trusts should be terminated. However, further proceedings are necessary to determine the proper handling of future trust management and to facilitate the liquidation and/or disbursement of remaining trust assets.

## F. Attorneys Fees

The Plaintiffs request an award of attorneys' fees incurred in prosecuting their claims against the Defendants.

The Supreme Court has held that the discharge exception under § 523(a)(2)(A) applies to all liability arising on account of a debtor's fraudulent conduct, including attorneys' fees and costs. *Cohen v. de la Cruz*, 523 U.S. 213, 223 (1998). The holding in *Cohen* is not limited solely to cases under § 523(a)(2)(A) as the Supreme Court also cited § 523(a)(4) and § 523(a)(6) as examples in which damages, including attorneys' fees, would be nondischargeable. *Fry v. Dinan (In re Dinan)*, 448 B.R. 775, 785 (9th Cir. BAP 2011); *see also Correia-Sasser v. Rogone (In Correia-Sasser)*, 2014 Bankr. LEXIS 3513, at *33-34 (9th Cir. BAP Aug. 19, 2014) (applying *Cohen* to § 523(a)(4)); *Bertola v. N. Wis. Produce Co. (In re Bertola)*, 317 B.R. 95, 100 (9th Cir. BAP 2004) (applying *Cohen* to § 523(a)(6)). "[U]nder *Cohen*, the determinative question for awarding attorney's fees is whether the creditor would be able to recover the fee outside of bankruptcy under state or federal law." *Dinan*, 448 B.R. at 785 (citing cases).

In Florida, a court may award attorneys' fees for actions arising under the Florida Trust Code for "breach of fiduciary duty or challenging, the exercise of, or failure to exercise, a trustee's powers." *Levine v. Stimmel*, 272 So. 3d 847, 849 (Fla. 5th DCA 2019) (citing Fla. Stat. § 736.1004). Fla. Stat. § 736.1004 provides that the court may award attorneys' fees "as in chancery actions." Under Florida's chancery rule, the court has the discretion, as justice so requires, to apportion the costs between the parties or to require the prevailing party to pay all costs. *Harrell v. Badger*, 171 So. 3d 764, 770 (Fla. 5th Cir. 2015) (citing *Nalls v. Millender*, 721 So. 2d 426, 427 (Fla. 4th DCA 1998)). The party seeking attorneys' fees has the burden to demonstrate what portion of the fees were expended on claims for which § 736.1004 authorizes attorneys' fees. *Levine*, 272 So. 3d at 848-49. Put another way, the Plaintiffs are only entitled to attorneys' fees under the Florida Trust Code for counsels' work performed in connection with the prosecution of Jan's breaches of fiduciary duties and not fees incurred in connection with unrelated or unsuccessful grounds for relief.

Here, the Plaintiffs are entitled to reasonable attorneys' fees under Florida law and a determination that a portion of those fees are nondischargeable under §§ 523(a)(4) and (a)(6). The Plaintiffs have not specified the amount of the award sought, nor have they provided supporting evidence. I will therefore reserve judgment on the amount and dischargeability of attorneys' fees and will require supplemental briefing, including necessary evidence, to be filed by the parties.

*CONCLUSION*

For the reasons stated above, I will enter a judgment: (1) liquidating and allowing the Plaintiffs' underlying claim and imposing a surcharge against the Defendants in the amount of **$853,067.84**;[18] (2) declaring that **$686,496.60** of the underlying debt is nondischargeable under §§ 523(a)(4) and (a)(6); (3) denying the Plaintiffs' claim for relief under § 523(a)(2)(A); (4) enjoining the Defendants from taking

---

[18] It is unclear under what capacity the Plaintiffs seek judgment against Mary. Because most, if not all, of the asserted acts underlying the judgment were taken by Jan, entry of judgment against the Defendants is only appropriate as a community obligation and not as a separate judgment against Mary. Furthermore, entry of a final judgment will fully resolve both proofs of claim which were consolidated into this proceeding. *See* Bankr. W.D. Wash. Case No. 18-13683-MLB, Dkt. No. 110.

any further action regarding the Trusts and suspending Jan as trustee of the Trusts; and (5) awarding the Plaintiffs attorneys' fees and costs in an amount to be determined.  Plaintiffs will be allowed a single general unsecured claim in the amount of the final judgment, but with any prejudgment interest limited to the date of petition. Prior to entry of a final judgment, I will set a status conference to discuss the form of order and remaining issues which either need further clarification or are unresolved.  These remaining issues include discussion of (1) how future trust management should be handled, including whether it is appropriate for me to order further accountings for recent periods; (2) whether prejudgment interest should be assessed;[19] (3) whether Plaintiffs seek a form of order that apportions a set amount of the judgment to Martin; and (4) setting the briefing schedule to determine an award of attorneys' fees.

/ / / End of Memorandum Decision / / /

---

[19] Although the matter of prejudgment interest is not raised in either the Amended Complaint or the post-trial briefing, determination of prejudgment interest was expressly included in the Pretrial Order.

**Table A**

| Disbursements to Jan | | | |
|---|---|---|---|
| **Trust** | **Date** | **Withdrawal** | **Plaintiffs' Exhibit No.** |
| RMMT | 4/7/2006 | $24,048.00 | 32 |
| MFLT | 4/7/2006 | $10,000.00 | 31 |
| MFLT | 5/4/2006 | $2,500.00 | 33 |
| RMMT | 6/1/2006 | $5,000.00 | 171 |
| MFLT | 8/29/2006 | $5,000.00 | 34 |
| MFLT | 8/1/2007 | $13,000.00 | 39 |
| MFLT | 10/4/2007 | $6,466.02 | 41 |
| RMMT | 6/12/2008 | $50,000.00 | 45 |
| MFLT | 11/21/2008 | $20,000.00 | 191 |
| RMMT | 5/28/2010 | $32,000.00 | 56 |
| RMMT | 11/4/2010 | $30,000.00 | 58 |
| RMMT | 3/7/2011 | $5,000.00 | 66 |
| RMMT | 1/31/2012 | $15,000.00 | 72 |
| RMMT | 3/1/2012 | $20,000.00 | 74 |
| RMMT | 8/14/2013 | $15,000.00 | 81 |
| RMMT | 4/17/2014 | $70,000.00 | 89 |
| RMMT | 4/25/2014 | $143,891.00 | 93 |
| MPT | 4/30/2014 | $141,416.00 | 96 |
| MPT | 5/19/2014 | $3,668.00 | 311 |

| | | | |
|---|---|---|---|
| MPT | 5/19/2014 | $992.60 | 311 |
| MPT | 2/12/2016 | $220,000.00 | 371 |
| RMMT | 3/25/2016 | $2,166.08 | 378 |
| MPT | 4/7/2016 | $66,285.00 | 379 |
| RMMT | 4/21/2017 | $3,060.86 | 405 |
| RMMT | 10/12/2017 | $10,000.00 | 414 |
| MPT | 2/17/2016 | $2,884.00 | 428 |
| MPT | 3/16/2016 | $2,596.93 | 428 |
| MPT | 10/27/2017 | $2,500.00 | 428 |
| MPT | 5/29/2018 | $5,065.95 | 428 |
| MPT | 5/30/2018 | $6,836.36 | 428 |

**Table B**

| Disbursements to Attorneys | | | | |
|---|---|---|---|---|
| **Trust** | **Date** | **Withdrawal** | **Transfer To/From** | **Plaintiffs' Exhibit No.** |
| RMMT | 5/9/2014 | $10,000.00 | Beliveau Law Group | 325 |
| MPT | 5/13/2014 | $3,000.00 | Brantley Oakey | 327 |
| MPT | 5/16/2014 | $3,000.00 | Brantley Oakey | 327 |
| RMMT | 5/9/2017 | $14,817.56 | Lindsay & Allen | 408 |
| MPT | 1/2/2018 | $2,400.00 | Lindsay & Allen | 417 |
| MPT | 1/2/2018 | $975.50 | Lindsay & Allen | 417 |
| MPT | 2/22/2018 | $2,000.00 | Lindsay & Allen | 419 |

| | | | | |
|---|---|---|---|---|
| MPT | 2/26/2018 | $3,288.39 | Lindsay & Allen | 419 |
| MPT | 4/3/2018 | $18,000.00 | Lindsay & Allen | 421 |
| MPT | 5/25/2018 | $825.00 | Lindsay & Allen | 422 |
| MPT | 5/25/2018 | $1,119.50 | Lindsay & Allen | 422 |
| MPT | 6/28/2018 | $3,064.50 | Lindsay & Allen | 424 |
| MPT | 6/28/2018 | $79.00 | Lindsay & Allen | 424 |
| MPT | 6/28/2018 | $65.00 | Lindsay & Allen | 424 |
| MPT | 6/28/2018 | $1,017.50 | Lindsay & Allen | 424 |
| MPT | 3/25/2016 | $5,738.00 | Lindsay & Allen | 428 |
| MPT | 6/1/2016 | $10,234.00 | Lindsay & Allen | 428 |
| MPT | 7/15/2016 | $7,767.16 | Lindsay & Allen | 428 |
| MPT | 3/3/2017 | $6,243.40 | Lindsay & Allen | 428 |
| MPT | 4/4/2017 | $2,697.10 | Lindsay & Allen | 428 |
| MPT | 4/4/2017 | $6,619.20 | Lindsay & Allen | 428 |
| MPT | 7/11/2017 | $7,271.47 | Lindsay & Allen | 428 |
| MPT | 10/12/2017 | $4,014.75 | Lindsay & Allen | 428 |
| MPT | 12/4/2017 | $4,915.50 | Lindsay & Allen | 428 |
| MPT | 1/26/2018 | $3,932.00 | Lindsay & Allen | 428 |
| MPT | 5/1/2018 | $9,010.45 | Lindsay & Allen | 428 |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**Table C**

| Distributions to Boston Company | | | |
|---|---|---|---|
| **Trust** | **Date** | **Withdrawal** | **Plaintiffs' Exhibit No.** |
| RMMT | 2/13/2006 | $10,000.00 | 27 |
| RMMT | 8/15/2006 | $20,000.00 | 180 |
| RMMT | 2/21/2007 | $30,000.00 | 185 |
| RMMT | 10/10/2007 | $40,000.00 | 186 |

**Table D**

| RMMT Distribution to Howard | | | |
|---|---|---|---|
| **Trust** | **Date** | **Withdrawal** | **Plaintiffs' Exhibit No.** |
| RMMT | 2009 | $85,000.00 | 198 |